Memorandum of Decision
On August 15, 2000, the Department of Children and Families hereafter, "DCF", filed a petition seeking the termination of the parental rights of Billiann D. and Stephen D. concerning their child, Jesse D., born on March 1998. On January 3, 2001, the father Stephen D. executed a consent to the termination of his parental rights, which the court (Quinn, J.) accepted. The petition alleges that Billiann has not achieved such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering Jesse's age and needs, she could assume a responsible position in his life. Connecticut General Statutes §17a-112 (j)(3) (B1). The additional ground of no ongoing parent child relationship was withdrawn by DCF at trial.
The court finds that notice of this proceeding has been provided in accordance with the Practice Book and this court has jurisdiction. The court further finds that no action is pending in any other court affecting the custody of Jesse. The court was presented with thirty-five full exhibits and heard the testimony of the social workers, police officers as well as the court appointed psychologist.
1. FACTS
A. Events Prior to the Filing of Neglect Petitions
Billiann is the biological mother of Jesse D., the subject of this petition. In addition, she is the biological mother of a 15-year old son born of a previous marriage. According to the evidence submitted to the court, Billiann was born in Morocco on April 4, 1955. Her father was a member of the Air Force, which required the family to move frequently. Billiann described herself as the outcast of the family, which in addition to her, included two sisters with whom she did not get along. In Billiann's last year of high school, the family moved from Connecticut to Florida. Billiann did not go with the family, choosing instead to remain in Connecticut to complete her last year of high school. Unfortunately, she did not complete high school.[2] The evidence established that Billiann was married to her first husband for twenty-two years, prior to their separation and divorce. Their marriage produced one child, Jason, CT Page 11004 who does not reside with Billiann. In July 1997, Billiann married Stephen D., Sr. Nine months later on March 1998, Jesse was born. Stephen, Sr. has one other child, fifteen-year old Stephen, Jr., a child born of his previous marriage. Stephen, Jr. lived with his father and his step-mother, Billiann during the first year of the couple's marriage.
The court heard the testimony of Deana Miranda, a DCF treatment worker assigned to this family in August 1998. She testified that this family first came to the attention of DCF in May 1998, when Jesse was barely four months old. As a result of an act of domestic violence between Stephen, Sr. and Billiann, Stephen, Sr. was arrested. The Criminal Division of the Superior Court issued a Protective Order while the case was pending. The Family Relations Office of the Superior Court referred the matter to DCF for investigation of any possible maltreatment of Jesse and Stephen, Jr.
While DCF was in the process of investigating this referral, the police department notified DCF of a second incident of domestic violence between the parties. Following the DCF investigation, Billiann signed a service agreement on May 22, 1998 in which she agreed to cooperate with DCF, and to attend domestic violence groups.[3] In addition, she agreed that Stephen, Sr. would have no contact with the children until the Protective Order was vacated by the Superior Court. Ms. Miranda testified that DCF closed the case in June 1998, because of Billiann's willingness to cooperate with services.
In July 1998, one month after closing the case, DCF received another referral concerning this family. The police reported a third incident of domestic violence. Following the incident, on July 14, 1998, Billiann left the marital home with her infant son, Jesse. She moved into a motor lodge. On July 15, 1998, she signed a second service agreement[4] and DCF opened the case for treatment.
Ms. Miranda testified that she was the case treatment worker to whom the case was assigned in August 1998. She testified that she attempted to locate Billiann at the motor lodge, but was told that Billiann was not registered as a guest. On August 6, 1998, Billiann went to the DCF office and expressed concern regarding her stepson, Stephen, Jr. She reported that Stephen, Sr was at a residential drug treatment program and that she was living in a tent at a campground in Lebanon. On that date, Billiann signed a third service agreement[5] in which she agreed to secure appropriate housing and to let DCF know her whereabouts. Because of her failure to find suitable housing and her non-compliance with the service agreement, on September 14, 1998, DCF filed a neglect petition.
B. Events Following the Filing of Neglect Petition
CT Page 11005
Despite Billiann's many agreements to obtain suitable housing for her and her infant son, Ms. Miranda testified that Billiann remained at the trailer park for the balance of 1998. Because the season was closing, however, it was critical that Billiann find other housing. In January 1999 Billiann left the trailer park with Jesse and her whereabouts were unknown to DCF.
On March 2, 1999, a full day trial was held on the neglect petition. Billiann and Stephen, Sr. appeared in court. The court (Dyer, J.) ordered the parents to keep Jesse in the State of Connecticut and in the care of his maternal grandmother until a final written decision was filed in the case. In addition, the court ordered that the father was not to have any unsupervised contact with Jesse. The following day the court was informed that Billiann had removed Jesse from her mother's care in violation of the court order. The removal was done in a dramatic style that placed Jesse at risk for serious harm. As soon as the court was informed of the flagrant disregard of its order as well as Jesse's exposure to harm, it issued an order vesting temporary custody of Jesse in DCF and scheduled the ten-day mandatory hearing for March 12, 1999. Ms. Miranda testified that two days after abducting Jesse, on March 4, 1999, Billiann returned Jesse to the DCF office. He was placed in foster care where he has remained.
The evidence established that when Jesse was first placed in foster care, at the age of twelve months, he was in need of Birth to Three services due to developmental delays. Unfortunately, his parents' erratic lifestyle forced little Jesse to spend extended periods of time confined in a car seat, with very little opportunity to freely move around. He was frequently traveling from motor lodges to tents to trailers.
C. Events Following the Adjudication of Neglect and Commitment of Jesse.
On March 8, 1999, the court issued its written decision committing Jesse to the care and custody of DCF and transferred guardianship and custody of Stephen, Jr. to an unrelated caretaker. At the ten-day hearing on March 12, 1999, Billiann signed a set of specific steps.[6] She was ordered to keep her whereabouts known to DCF, to complete parenting classes, to initiate and follow through with individual counseling and domestic violence classes, to attend a substance abuse evaluation and random urine testing. She was also ordered to cooperate with a court ordered psychiatric evaluation. Since DCF was planning on a reunification of Jesse with his mother, a visitation schedule was also established.
The testimony of Ms. Miranda established that Billiann was referred to a number of programs to assist her in reuniting with her son. She was CT Page 11006 referred to the Interval House for domestic violence counseling, the Genesis Center, Inc. for substance abuse evaluation and urine testing, the Manchester Hospital for substance abuse counseling and the Hockanum Community center for individual counseling.
On April 1, 1999, Billiann was scheduled for a urine drug screen. She did not attend. On April 5, 1999 she was scheduled for a hair test, she did not attend. On April 14, 1999, the Genesis Center advised DCF in writing that Billiann had not rescheduled any of her appointments. They requested that DCF provide direction as to how to proceed with the case. The evidence established that Billiann did not attend the group therapy sessions scheduled for June 29, 1999, July 13, 1999, July 20, 1999, July 27, 1999, October 26, 1999 and January 12, 2000.[7]
The evidence further established that Billiann did not comply with the urine testing and that when she did comply, the results were considered "atypical". The results of the drug tests of July 29, 1999, October 12, 1999, December 7, 1999, January 5, 2000 were all "atypical".[8] She failed to attend drug tests scheduled for October 29, 1999 and August 23, 1999.[9]
In compliance with a court order, on May 31, 1999, Billiann attended a psychiatric evaluation with the court appointed evaluator, Richard B. Sadler, MD. In his report of June 5, 1999, Dr. Sadler opined that Billiann "demonstrates the psychiatric condition of character pathology or a personality disorder that is consistent with an antisocial personality style as well as a Borderline Personality Disorder." Dr. Sadler found Billiann to be a totally unreliable reporter as well as someone whose judgment is seriously impaired. He concluded that Billiann's impaired judgment and her erratic behavior, both personality characteristics, severely impair her ability to provide ordinary, stable or minimally adequate care for her child."[10]
On June 16, 1999, Billiann attended a substance abuse evaluation at the Genesis Center, Inc.[11] In this seven-page report the evaluator noted that Billiann's manner of dress posed certain questions regarding her reliability as a reporter. At the time of the interview, Billiann was wearing a long-haired black wig. Billiann explained to the evaluator that she wore a wig because she had shaved her head. She explained that DCF had scheduled an appointment for her to have a hair test, and she believed that she would not be able to comply because she had a "hair weave"[12] Since she could not afford to have the weave removed she wanted DCF to pay for the removal of the hair weave. DCF explained that all that was required was twenty strands of hair, which could be obtained despite the hair weave. She chose to shave her head instead and wear a wig. As a result of this, the hair test was never done and the evaluator CT Page 11007 concluded that Billiann's "reported use of substances may be understated."[13]
The evaluator listed Billiann's diagnosis as Other Substance Induced Anxiety Disorder Specific to Sudafed and nasal spray. The evaluator recommended that Billiann participate in the Early Intervention psycho-education group beginning on June 29, 1999. She also referred Billiann to random drug screens. As stated previously, Billiann did not comply with the evaluator's recommendations regarding group therapy or drug testing. Although there is evidence that indicates that Billiann did participate in a hair test on February 1, 2000, the court questions the legitimacy of the negative findings due to a statement on the face of the report indicating that the signature of the Collector of the sample was missing. However, even if the signature of the collector were not missing, Billiann's failure to promptly comply with the repeated requests for the test is without any reasonable excuse.
Ms. Miranda also testified that although Billiann was referred to the Manchester Hospital for counseling she elected to attend the Interface Counseling Center for two sessions in 1999, one on August 2nd and the other on August 9.[14] The counselor Richard Mellon, however, was of the opinion that a female therapist would better serve Billiann's needs, and discontinued treatment with her.
The evidence clearly indicates that Billiann did not consider the need for services as a priority in her life. There was always an event; crisis or conditions that she placed ahead of her own need to address the issues that prevented her from parenting her son. Despite the amount of services made available to Billiann, she was not able to move closer to reunification during her son's first year in foster care.
She did, however, attempt to maintain a connection with Jesse. Although she was inconsistent with visits with her son during his first few months in a foster home, she did attempt to correct the inconsistent quality of the visits during the remainder of Jesse's first year in foster care. She started to confirm her visits twenty-four hours in advance, as well as attend. Unfortunately, she would "cycle between missing a month's worth of visitation, and then consistently attending."[15] In addition, she would arrive late for the visits.
On February 15, 2000, as Jesse was about to enter his second year in foster care, the court, (Keller, J.) found that continued efforts towards reunification of Jesse with his mother were no longer appropriate. In addition to the lack of compliance with the services just discussed, on January 12, 2000, the Manchester Hospital advised DCF that they would be closing their case with Billiann due to her missed appointments and an CT Page 11008 inability to contact Billiann. As a result of the lack of compliance Billiann did not complete the service plan that had been designed for her.[16]
The court heard the testimony of Kimberly Mahan, the DCF social worker to whom the case was assigned to on June 6, 2000. Ms. Mahan testified that she made several home visits to Billiann, some of which were announced and some were unannounced. Ms. Mahan testified that during the visits she would attempt to encourage Billiann to cooperate with the services offered by DCF. On one occasion, as she discussed the importance of attending the domestic violence group meetings, Billiann responded that she needed a break from the classes. She also reported that she discontinued seeing an individual counselor because she did not have any insurance to pay for the sessions. In addition, she reported that she and her mother, who had always been Billiann's personal support system, were no longer on speaking terms. She was also facing an eviction.
It is not unreasonable to believe that Billiann experienced a sense of hopelessness as she confronted these events in her life. Coping with significant loss is never easy. These periods of personal crisis however, if confronted properly, can be transformed into positive change and growth. It is critical, however, that the desire and will to change as well as a recognition of one's contribution to the crisis, be present. As Dr. Sadler noted, Billiann's presenting obstacle and challenge was recognizing her contribution to the negative events in her life.
Notwithstanding the chaos in her life, Billiann was scheduled to have weekly visits with her son during June, July and August of the year 2000. The chaos, however, interrupted any consistent contact between mother and son. According to the log of Billiann's visitation schedule,[17] Billiann visited two-year old Jesse twice in June, twice in July and three times in August.
Although Billiann did not participate in most of the reunification services provided to her, the court notes that evidence was introduced at trial to indicate that Billiann did participate in the ECHN Family Development Center at the Manchester Hospital. According to the Center's report[18] Billiann participated in a sixteen-week program entitled Parent Education Family Management Series. She started this program on October 7, 1999 and completed it on March 8, 2000. The court credits Billiann with this accomplishment; nevertheless one parent education course cannot take the place of a steady course of counseling to address the complexities identified by Dr. Sadler as well as other evaluators.
Unfortunately for Billiann, her failure to address the issue of substance and alcohol abuse in her life continued to create difficulties CT Page 11009 for her. On July 7, 2000, Billiann was involved in an automobile accident. The court heard testimony from Officer Michael Broullard, the police officer who responded to the scene of the accident. According to the police report of the incident,[19] Billiann lost control of her car and hit the curb. She and a friend were returning from an evening at an establishment known as the Brickyard where Billiann admitted that she consumed four drinks of Tequila. Both Billiann and her passenger sustained physical injuries. When the police arrived at the scene, Billiann was unable to complete the Standardized Field Sobriety Test. She was taken into custody by the police for Driving under the Influence.
A few weeks after the accident, on July 19, 2000, Jesse was moved from his foster home to a pre-adoptive placement. Fortunately, the home is described as structured and predictable, something a two-year old in this situation desperately needs.
D. Events Following the Filing of the Petition to Terminate Parental Rights
On August 15, 2000, DCF filed a petition to terminate Billiann's parental rights. Ms. Mahan continued the announced and unannounced visits to Billiann's home. Moreover, Ms. Mahan testified that she continued to attempt to engage Billiann in services. At one unannounced visit in September 2000, Billiann introduced Ms. Mahan to Mr. G., whom she identified as her fiancé. Since Billiann was ordered pursuant to specific steps signed on March 12, 1999, to notify DCF of any changes in the composition of her household,[20] Ms. Mahan questioned Billiann regarding her involvement with Mr. G. Ms. Mahan attempted to determine if Mr. G. had a criminal record. He admitted to her that he had been arrested for Driving under the Influence.
The court heard the testimony of Officer Hardie Burgin, a member of the East Hartford Police Department. He testified that he was investigating a death that occurred on July 28, 2000. During the course of the investigation, in November 2000, he received information indicating that Mr. G. may be able to shed some light in the case. He learned that Mr. G. was staying with Billiann; he went to Billiann's apartment, where he found both Billiann and Mr. G. The supplemental police report of this encounter[21] indicates that a strong odor of marijuana was present in the apartment. According to the police, Mr. G. originally implicated Billiann in his recitation of the events of July 28, 2000. However, when Billiann challenged Mr. G. in the presence of the police officer, he changed his story to exclude Billiann from any participation in what was described as a drug-buying spree in Hartford. He maintained, however, that after the drugs were finally purchased, Billiann joined him in using the drugs. CT Page 11010
While all of this was taking place in Billiann's life, Jesse remained in his foster home. As stated previously, Billiann had time for only two visits with Jesse in July and only three visits in August. As the fall and winter of 2000 approached, Billiann saw Jesse once in September, once in October and once in November. The evidence established that Jesse did not see his mother during the holiday season in December. He did have a visit with his mother on January 18, 2001 and on February 8, 2001.
On October 11, 2000, Dr. Sadler, the court-appointed evaluator, performed a follow-up evaluation of Billiann and Stephen, Sr. He also observed a parent-child interaction. He testified regarding his opinion of Billiann's parenting capacity given her psychological profile. Because he was familiar with Billiann as a result of his evaluation of her sixteen months earlier, he was in a position to comment regarding the extent to which Billiann may have benefitted from the limited services in which she participated.
Regrettably, Dr. Sadler opined that Billiann did not experience any positive change since the last time he saw her. She did not express any gain in insight into the events that led her to this point in her life. Dr. Sadler testified that support for his opinion could be found in Billiann's description of her encounters with DCF as simply "misunderstandings".
He further described Billiann as demonstrating an anti-social personality disorder, which he defined as "an enduring manner and style of perceiving the world which gets you in trouble, but you don't change it to help you. In Billiann's case, she misrepresents the facts, this is an element of deception." He characterized her summary of the events in her life as "remarkable".
Tragically for Billiann, the dysfunction in which she operates does not let her take Jesse's needs into account. Dr. Sadler stated that although Billiann has a certain amount of charm, that is not enough to let her effectively parent Jesse. He believes that "Jesse had been delayed because of his functioning in the biological family." Dr. Sadler further testified that "although Billiann completed several parenting courses, she never said, `Here's how I am different'." He does not believe that Billiann could experience a sufficient change to consistently parent Jesse.
2. ADJUDICATION
A. Reasonable Efforts.
"As part of the adjudication process, § 17a-112 (c)(1) requires CT Page 11011 that the court find by clear and convincing evidence that `the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . .'
Before a termination of parental rights can be granted, the trial court must be convinced that the department has made reasonable efforts to reunite the child with his or her family . . . The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof . . . [R]easonable efforts means doing everything reasonable, not everything possible . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) In re Tabitha T., 51 Conn. App. 595, 599-600,722 A.2d 1232 (1999).
The court finds by clear and convincing evidence that Billiann is unwilling and unable to benefit from reunification services. Notwithstanding this finding, the court further finds that DCF has made reasonable efforts to reunite Jesse with his mother. The evidence establishes that Billiann was referred to many services while her son was in foster care. Despite a court ruling on February 15, 2000 that reasonable efforts were no longer appropriate, DCF continued visitation coordination, home visits and service referrals.
B. Adjudication
The court finds by clear and convincing evidence that Billiann has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. Connecticut General Statutes § 17a-112
(j)(3) (B1).
3. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (k):
1. Appropriate and timely services were provided by DCF to the family. These included parenting classes, domestic violence group meetings, individual counseling, visitation coordination, substance abuse evaluation and counseling.
2. As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family. The CT Page 11012 court also finds that Billiann was unable and unwilling to benefit from reunification services.
3. The court finds that reasonable court expectations were set for Billiann. Billiann was not able to fulfill them. No demonstrable change in her behavior has taken place.
4. The court finds that Jesse has a connection with his mother. He is comfortable in her presence. He also has a connection with his foster parents with whom he has lived since July 19, 2000. He has done well with this family in that he is no longer in need of special services to address any developmental delays. This family has been meeting his physical and emotional needs.
5. Jesse was born on March 1998. He just turned three this past March.
6. As discussed in detail above, the court finds that Billiann has not made any changes in her life to accommodate the care and nurturing of Jesse.
7. No unreasonable conduct is noted in the conduct of the child welfare agency or on the part of any person so as to prevent Billiann from maintaining a meaningful relationship with Jesse. While her economic means are limited, they did not prevent her from developing a meaningful relationship with her son.
4. DISPOSITION
Jesse has spent two-thirds of his short life in foster care. He is in need of permanency. He is living with a family that is interested in meeting his need for permanency by adopting him. If Billiann were to seriously attempt to deal with her life issues, she would require an additional period of time to begin the process of overcoming denial, confronting her weaknesses and ultimately the acceptance of herself. Billiann has been involved with services for close to three years. Unfortunately, there has been no positive change. There is no reasonable basis to believe that giving her additional time would be in Jesse's best interest. The court concludes, based on clear and convincing evidence, that termination is in Jesse's best interest. Accordingly, a termination of the parental rights of Billiann D. and Stephen, Sr. is ordered. The Commissioner of the Department of Children and Families is hereby appointed statutory parent for the purpose of securing an adoptive family and permanent placement for him. The Commissioner shall file a report with the court within thirty days. Said report shall comply with State and Federal law. CT Page 11013
Carmen L. Lopez, Judge Child Protection Session